In The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

## NO. 09-19-00278-CV
_____

## BBX OPERATING, LLC, Appellant

## V.

## AMERICAN FLUORITE, INC., GEOSOUTHERN ENERGY PARTNERS, LP, and GEOSOUTHERN ENERGY CORP., Appellees

**On Appeal from the 1st District Court**
**Jasper County, Texas**
**Trial Cause No. 35155**

## MEMORANDUM OPINION

The underlying litigation arises from a dispute over revenue payments, joint interest billings, and expenses incurred in the development of oil and gas prospects. In six issues, BBX Operating, LLC (BBX) appeals the trial court's summary judgments in favor of American Fluorite, Inc. (AFI), GeoSouthern Energy Partners, LP (GSEP), and GeoSouthern Energy Corp. (GSEC) (collectively, "GeoSouthern"

or "Appellees"). For the following reasons, we affirm the trial court's judgment in part and reverse and remand in part.

## I. Background

### A. Parties' Relationship

BBX and GeoSouthern had a lengthy relationship pursuing oil and gas drilling opportunities within various East Texas counties. As a means to develop these prospects and achieve producing wells within defined geographical areas, the parties entered into joint development agreements (JDAs), which preceded the joint operating agreements (JOAs).[1] The JDAs at issue are the Neches II AMI (or "area of mutual interest") and Make My Day JDA. Pursuant to these agreements, BBX acted as the operator, and the GeoSouthern entities held working interests in varying percentages.[2]

The underlying lawsuit involved a dispute over BBX withholding GeoSouthern's production revenues, GeoSouthern's payment of joint interest billings to BBX ("JIBs"), and amounts sought by BBX through "Cash Call" letters, which BBX characterized as "Prospect Development Costs."[3] BBX incurred the

---

[1] The parties also referred to these as "areas of mutual interest" or "AMIs" throughout the trial record.

[2] There are also other working interest owners, which are not parties to this litigation.

[3] The parties also referred to these expenses as "unproposed well costs" and "pre-development costs" throughout the record.

costs delineated in the "Cash Call" letters after the acquisition of the leasehold interests but before drilling wells.

**1. Neches II AMI**

The Neches II agreement designated BBX as the operator and provided that any party to the agreement could acquire leasehold interests within the AMI. Likewise, any party to the agreement could propose wells by giving written notice as follows:

> WELL PROPOSALS: Well proposals shall include a) a plat showing the proposed surface and bottom hole locations, b) a geological prognosis to include the intended target zone (or zones), and c) AFE. Each Party will either elect to participate in the proposed well within thirty (30) days of receipt of the well proposal or go non-consent in the proposed well pursuant to the terms of the JOA. All operations on each well drilled on the subject lands or lands pooled therewith shall be governed by the terms of the JOA. Although the designated Operator shall use its best efforts to prepare and provide to each Party for execution a separate JOA for each well and unit in which each Party elects to participate, the terms of such JOA will apply to and be binding on the Parties regardless of whether same is actually executed. If there are any conflicts between the terms of the JOA and this Agreement, the terms of this Agreement shall super[s]ede and control. Upon the completion of any well, each non-operating Party shall timely receive all geological well information, permits, and government reports.

**2. Make My Day JDA**

The Make My Day agreement also designated BBX as the operator, and BBX would "have the sole option to propose units and wells within the defined areas; however, the JOA shall govern the right to propose wells within defined units." The contract provided wells would be proposed as follows:

**INITIAL WELL PROPOSALS**. Any proposal of a well will include, but will not be limited to, the selection of the drill site, a good faith estimate of the size and configuration of the proposed unit for said well(s), the approximate total acreage to be included in the unit, a geological prognosis to include the intended target zone or zones, and an Operating Agreement, which will govern all operations conducted within such boundaries of the unit ("Proposed Unit"), identical to the form attached hereto as Exhibit B, as to those Parties electing to participate in the drilling of the proposed well and all operations to be conducted within the proposed unit. The proposed well will be designated as the "Initial Well" as that term is described and used in article VI, A. of the JOA. Additionally, such notice will contain the surface location of the well, the objective depth of the well and an estimate of the cost of drilling and completing the well for production.

The parties receiving the Initial Well proposal shall have thirty (30) days after receipt of the proposal to notify the proposing party in writing, **whether they elect to participate in the cost of the Initial Well** ("Participating Parties") or elect to relinquish their interest in the proposed well, and all future well(s) proposals, along with rights to any future leasehold purchased, within the proposed unit area. All parties electing to participate in the Initial Well will immediately execute and return the Operating Agreement provided in the proposal. If one (1) or more Parties elect not to participate in the Initial Well, then the proposing party shall give written notice of same to those Participating Parties within twenty (20) days following the expiration of the thirty (30) day election period set forth above. The Participating Parties shall then have the option for ten (10) days, following receipt of such written notice to elect to participate for their proportionate share of the interest available.

. . .

All future proposals and operations conducted within any established JOA contract area following the drilling of the Initial Well in a unit shall be governed by the terms and conditions of the JOA which will supersede the provisions in this Agreement.

(Emphasis added.) The Make My Day JDA further provided that "[p]articipation in

any of the Areas of Mutual Interest identified may be reduced, relinquished or

otherwise limited based on elections not to participate or any failure to submit any payments required as provided elsewhere in this agreement."

### 3. Prospect Development

AMIs or JDAs precede JOAs; once a well is put on production, a JOA is usually the next contract. Under the terms of the JDAs, well proposal submissions to the interest owners contained certain requisite information, along with an "authorization for expenditure" ("AFE"), which broke down the costs incurred in pursuing the well. The well proposal also included an election where the interest owner could consent or non-consent the well. If the interest owner consented, thereby electing to participate, they signed the operating agreement included with the proposal. If participating, the interest owner also sent payment for its proportionate share of the costs in the AFE. If an interest owner elected to non-consent the well, it would not pay the AFE costs, but it relinquished any interest in the well and any subsequent wells in the unit, and its interest would be offered to the other interest owners; if the other interest owners elected to participate, they would then pick up that share of the costs.

After the parties agreed to a well proposal and the JOA was in place, BBX began sending JIBs for monthly costs associated with each well to the participating interest owners. According to BBX's accountant, Laurel Vance, "Cash Calls" were handled as "off book" transactions, but if a party consented to a well, those were

handled as prepayment.[4] Once the participating parties executed a JOA, that agreement governed the payment of revenues, as well as remedies for non-payment of JIBs. According to BBX's accountant, JIBs are generated on a well-by-well basis. Under the JOA, BBX, as the operator, had the right to offset or net JIBs if any party defaulted only within that particular contract area.[5]

### 4. "Cash Calls" and Dispute

In May 2015, BBX sent nine "Cash Call" letters to the GeoSouthern entities for costs it purportedly incurred in the areas covered by these two agreements, totaling $4,219,597.55, and asserted in the letters that the AMIs/JDAs gave them the authority to do so. Each "Cash Call" letter cited to the applicable JDA, and stated that the agreement "allows BBX Operating, LLC to "Cash Call" partners for the expenses incurred for brokers fees, title examination, title curative and other expenses incurred for preparing tracts of land to be included in a future Drilling Unit(s)." The letters further advised:

> [The GeoSouthern entity] has 30 days from receipt [of] this notice to elect and pay its share of expenses. Under our agreement, if [the GeoSouthern entity] elects not to pay its share of the expenses then [the GeoSouthern entity] shall be deemed to have elected not to participate in the Leasehold Acquisition and deemed to have elected not to participate in any drilling and development of the leasehold within the AMI. Based on the deemed elections, [the GeoSouthern entity's]

---

[4] "Off book" transactions were costs accumulated by the operator for which no division of interest had been created to bill out on a joint interest billing.

[5] The record reflects that GeoSouthern does not dispute BBX's right to net or offset JIB payments against revenues.

leasehold and right to participate in a future Drilling Unit will be offered to any participating parties within the [Prospect Area].

GeoSouthern contended that the Neches II and Make My Day JDAs did not permit BBX to recover these costs in the absence of a specific well proposal. GeoSouthern further argued it was not liable for costs submitted with a well proposal if they non-consented the proposal. Beginning in August 2015, BBX withheld GeoSouthern's revenue payments. While GeoSouthern refused to pay the prospect development costs demanded in the "Cash Call" letters, it continued paying JIBs until Estis Compression placed liens on certain wells. GeoSouthern then withheld JIB payments only on the wells with liens. On December 17, 2015, GeoSouthern sent a letter demanding BBX release their revenue payments and filed suit against BBX shortly thereafter.

## B. Procedural History

### 1. Original Petition

On December 23, 2015, the plaintiffs filed their original petition against BBX. In it, they alleged that BBX is the operator of certain oil and gas leases (the "Subject Leases") in Jasper, Tyler, and Polk County, Texas. The GeoSouthern entities also alleged that they own undivided mineral leasehold working interests in the Subject Leases and that BBX and AFI, among other entities, are parties to certain joint operating agreements and related development agreements. In support of its claims, GeoSouthern attached its demand letter to BBX and BBX's "Cash Call" letters dated

7

May 27, 2015, alleged to represent costs incurred and paid by BBX in conjunction with the Neches II Prospect which include the Turkey Creek, Lake Tejas, Frog Pond, and Fish Camp Prospects in Tyler County; Make My Day and Swamper Prospects in Jasper County; and the Ollie East Prospect in Polk County. GeoSouthern asserted claims for breach of contract, conversion, statutory lien, declaratory judgment, and a Texas Natural Resources Code claim. On January 29, 2016, BBX filed its original answer, asserting a general denial.

## 2. Rule 11 Agreement

On March 7, 2016, less than three months after GeoSouthern sued BBX, the parties entered into a Rule 11 Agreement,[6] providing in relevant part:

> 4. <u>Payment of Revenue to GeoSouthern for March 2016 and thereafter</u>. Beginning March 25, 2016 and continuing on the 25th day of each month thereafter (or the next business day if the 25th day falls on a weekend or legal holiday), BBX shall wire transfer in immediately available funds GeoSouthern's revenue payment for production for the preceding month; provided however, nothing herein shall modify or alter GeoSouthern's right to take in kind or seek division orders respecting payment of revenue or any other rights of GeoSouthern under the applicable joint operating agreements or related documents or applicable law.
>
> 5. <u>Payment of joint interest billing charges for August 2015 through January 2016.</u> Provided that GeoSouthern receives the payments referenced in paragraph 3 by 12:00 p.m., central standard time, on the same day that GeoSouthern receives the payments in paragraph 3 herein, GeoSouthern shall wire transfer immediately available funds of

---

[6] During oral argument, the parties explained that the Rule 11 agreement was intended to provide for agreeable payment schedules of all expenses and revenues, save and except the Prospect Development Costs.

$1,295,761.29 to BBX for GeoSouthern's joint interest billings for August, September, October, November, and December 2015, and January 2016, after adjustments for cash call payments, as set forth on **Exhibit C**. Otherwise, GeoSouthern will wire transfer such funds the next business day. Such payment shall not waive, impair, prejudice or otherwise affect GeoSouthern's right to audit or dispute any joint interest billing charges under the terms of the applicable joint operating agreements or related agreements or applicable law.

6. Payment of joint interest billings for February 2016 and thereafter. GeoSouthern will pay joint interest billings from BBX for the month of February 2016 and thereafter in accordance with the terms of the applicable joint operating agreements.

A dispute subsequently arose regarding the Rule 11 Agreement, with each party alleging the other failed to perform.[7] Beginning with the October 25, 2016 payment, BBX withheld revenue payments from GeoSouthern and began netting their JIBs. Although BBX's corporate representative, John Gaines, and accountant, Laurel Vance, testified that GeoSouthern's JIB amounts had been netted and GeoSouthern did not owe any JIB amounts, BBX continued to withhold revenue payments from GeoSouthern.

---

[7] Both parties filed motions to enforce the Rule 11 Agreement, with the trial court ruling in GeoSouthern's favor. BBX filed a petition for writ of mandamus, which this Court conditionally granted. *See In re BBX Operating, LLC*, No. 09-17-00079-CV, 2017 WL 1437135, at *1–2 (Tex. App.—Beaumont Apr. 20, 2017, orig. proceeding) (mem. op.).

### 3. Third Amended Petition

According to their third amended petition,[8] the Appellees and BBX entered into certain joint operating agreements and related development agreements (the "Subject Contracts") that govern the parties' rights and obligations with respect to operations on the Subject Leases. GeoSouthern alleged that they had fully paid all undisputed JIBs, but that BBX improperly withheld and continued to withhold GeoSouthern's proceeds from hydrocarbon sales. GeoSouthern asserted various claims against BBX: (1) breach of contract; (2) conversion; (3) section 91.402(a) of the Natural Resources Code; (4) foreclosure of a statutory lien; (5) breach of Rule 11 Agreement; and (6) declaratory judgment pertaining to the amounts lawfully owed, the authority to withhold, net, or offset revenue, and for BBX's removal and replacement as operator.

### 4. First Motion for Partial Summary Judgment and Order

In its first motion for partial summary judgment, GeoSouthern addressed its affirmative claims, including its claim for breach of contract based on the JDAs and Rule 11 Agreement and its claim for declaratory judgment. The summary judgment record included GeoSouthern General Land Manager Doug Dahmann's affidavit, the Neches II JDA, the Make My Day JDA, the parties' Rule 11 Agreement, the

---

[8] The third amended petition was the live pleading on file at the time GeoSouthern filed its first and second partial summary judgment motions.

deposition testimony of BBX corporate representative John Gaines, Turkey Creek Well Proposal dated August 24, 2015, AFI's letter indicating it "elected to go non-consent" to the Turkey Creek Well Proposal, BBX General Counsel Mark Helmueller's Affidavit dated December 13, 2016, BBX's authenticated "Statement of Account" reflecting what GeoSouthern and BBX owed, and BBX's May 2015 "Cash Call" Letters.

In response, BBX objected to the affidavit testimony of Dahmann and argued GeoSouthern's summary judgment evidence was not sufficient to entitle it to judgment as a matter of law on its claims for breach of contract.

The trial court granted GeoSouthern a partial summary judgment as to the breach of contract claims and found the summary judgment record conclusively showed the amount of $1,714,547.65 for production revenues was owed to GeoSouthern as of July 31, 2017, and awarded it damages in that amount. The trial court also rendered declaratory judgment in GeoSouthern's favor:

> 2. Non-joint operating agreements and/or demands which are included in the summary judgment record including the (i) "Cash Call Letters" (attached as Exhibit A-2 to the MPSJ); (ii) Area of Mutual Interest Agreement Neches II Prospect Area Tyler County, Texas (attached as Exhibit A-3 to the MPSJ); or (iii) Make My Day Joint Venture Development Agreement Tyler and Jasper Counties, Texas (attached as Exhibit A-4 to the MPSJ) do not authorize BBX to withhold oil and gas revenues from GeoSouthern;
>
> 3. Non-joint operating agreements and/or demands which are included in the summary judgment record including the (i) "Cash Call Letters" (attached as Exhibit A-2 to the MPSJ); (ii) Area of Mutual Interest

11

Agreement Neches II Prospect Area Tyler County, Texas (attached as Exhibit A-3 to the MPSJ) or (iii) Make My Day Joint Venture Development Agreement Tyler and Jasper Counties, Texas (attached as Exhibit A-4 to the MPSJ); do not authorize BBX to net or offset revenues that BBX owes to GeoSouthern against any non-joint interest billing amounts asserted by BBX; and

4. GeoSouthern has no obligation under the Area of Mutual Interest Agreement Neches II Prospect Area Tyler County, Texas (attached as Exhibit A-3 to the MPSJ) to pay any pre-development or unproposed well costs that BBX claims in connection with the Turkey Creek Prospect.

## 5. BBX's Counterclaims

In February of 2018, BBX filed its amended counterclaim against GeoSouthern and brought breach of contract claims under the Neches II and Make My Day agreements, in addition to claims for quantum meruit seeking to recover those portions of the unproposed well service expenses it attributed to GeoSouthern.

## 6. Second Motion for Partial Summary Judgment and Order

GeoSouthern's second motion for partial summary judgment addressed BBX's counterclaims for breach of contract and quantum meruit. GeoSouthern sought dismissal of BBX's breach of contract claims because the JDAs expressly provided for the recovery of the costs BBX sought in the "Cash Call" letters; that is, only after a written well proposal was presented to the working interest owners and the working interest owners expressly elected to participate in the proposed well would a party pay its portion of such expenses when it returned a signed agreement. GeoSouthern also argued that the trial court should dismiss BBX's quantum meruit

12

"Cash Call" Claims since the JDAs expressly provided for the sharing of those costs between interest owners who elected to participate thereby barring the claims by the express contract rule. GeoSouthern finally contended that GeoSouthern did not accept or benefit from the unproposed well services and BBX did not reasonably notify GeoSouthern it expected payment for them. Only if the working interest owners elected to participate in a proposed well, at that point, each participant would pay for their share of the costs associated with the development and drilling of the well. If the interest owners elected not to participate, they would not be responsible for their proportionate share of expenses, but in doing so, they forfeited their right to participate in that well, as well as future wells within the leasehold, with their share being offered for reallocation to the other working interest owners.

In response, BBX argued a) there was no express contract, specifically a JOA, that could address BBX's recovery of prospect development costs, and b) there remained genuine issues of material fact regarding the elements of its quantum meruit claim that would preclude summary judgment. BBX contended that neither the JOAs or JDAs address how prospect development costs—those costs incurred to develop and operate wells within the prospect areas after leasehold interests are acquired—are to be incurred and paid for by the interest owners. BBX contended that the JDAs covered leasehold acquisitions costs and well proposals, but the payment of prospect development costs was to be addressed by a separate contract,

13

the JOAs. BBX argued that expenses incurred after leasehold acquisition but before a well proposal were not expressly covered under the JDA provisions pertaining to well proposals but were informally consented to by the parties and subsequently reimbursed to BBX by the interest owners.

The summary judgment evidence included the Neches II JDA and Make My Day JDA, the "Cash Call" letters, BBX's notice of withdrawal as operator, deposition testimony from BBX corporate representative John Gaines, BBX General Counsel Mark Helmueller's deposition testimony, BBX Accountant Laurel Vance's deposition testimony, October 16, 2015 correspondence from Mark Helmueller, Lake Tejas Well Proposal and JOA, Turkey Creek Well Proposal and non-consent, and Doug Dahmann's affidavit. The trial court again granted GeoSouthern's summary judgment motion ruling that the JDAs were written contracts that expressly covered the costs associated with the prospect development expenses, the contracts did not permit the recoupment of the prospect development costs in the manner sought by BBX and therefore, GeoSouthern did not breach the JDAs by its refusal to pay the "Cash Call" Claims. Finally, the trial court granted GeoSouthern's second motion for partial summary judgment in its entirety and dismissed all counterclaims BBX asserted.

### 7. BBX's Second Amended Counterclaim

In October 2018, BBX filed its second amended counterclaim. In addition to its breach of contract and quantum meruit claims, BBX added affirmative claims for promissory estoppel.

### 8. Fourth Amended Petition

On March 4, 2019, GeoSouthern filed its fourth amended petition, asserting (1) breach of contract claims for damages based on the JOAs and Rule 11 Agreement, (2) a claim pursuant to Texas Natural Resources Code section 91.402, (3) a statutory lien claim pursuant to Texas Business and Commerce Code section 9.343, and (4) declaratory judgment for all amounts lawfully owed by GeoSouthern based on the AMI Agreements, the Turkey Creek proposal and non-consent, and Rule 11 Agreement. In addition to liquidated damages, GeoSouthern sought pre-judgment and post-judgment interest, costs, and attorneys' fees.

### 9. Motion for Final Summary Judgment and Order

GeoSouthern's motion for final summary judgment addressed its outstanding affirmative claims against BBX and BBX's outstanding counterclaim for promissory estoppel against GeoSouthern. Specifically, GeoSouthern set out in the motion that it sought final judgment on all revenues from hydrocarbon sales BBX owed GeoSouthern, because the first partial summary judgment only addressed revenues through July 31, 2017. In relation to this claim, GeoSouthern sought total revenues

15

due in the "Principal Amount" of $2,659,473.20 or the "Alternate Principal Amount" of $2,441,732.24, dependent on whether BBX was authorized to withhold $217,740.96 in revenues that Murphy Energy Corp. had refused to pay BBX for the sale of hydrocarbons.[9] In the further alternative, GeoSouthern sought the "Admitted Principal Amount" of $2,436,547.65 based on BBX corporate representative's deposition testimony. With respect to prejudgment interest on the unpaid revenues, GeoSouthern sought:

> (i) $261,548.32 in prejudgment interest on the Principal Amount under the Texas Finance Code, (ii) $249,266.38 in prejudgment interest on the Alternate Principal Amount, or (iii) $145,789.28 on the Admitted Principal Amount.

> *OR*

> GeoSouthern seeks (i) $158,202.54 in prejudgment interest under the Texas Natural Resources Code on the Principal Amount, (ii) $152,387.66 in prejudgment interest on the Alternate Principal Amount, or (iii) $69, 199.52 on the Admitted Principal Amount.

GeoSouthern also sought post-judgment interest on all amounts BBX owed at the rate of five percent per annum. Finally, GeoSouthern sought "reasonable and necessary attorneys' fees" of not less than $550,060, and "such other and further relief to which they show themselves justly entitled."

---

[9] The record reflected that purchaser Murphy Energy filed for bankruptcy and failed to pay BBX the of amount $217,740.96 attributable to GeoSouthern's revenues.

With respect to BBX's promissory estoppel counterclaim, GeoSouthern sought summary judgment based on the "legal ground that promissory estoppel is not recognized as an affirmative cause of action[.]" GeoSouthern incorporated the "findings and rulings" of the trial court's prior summary judgment orders into its motion for final summary judgment and argued that "[i]n addition to the reasons set forth in the Court's 10/2018 MPSJ Order, the Court should dismiss BBX's promissory estoppel claims" because "promissory estoppel is defensive only, and cannot constitute a basis for affirmative relief."

The summary judgment evidence included: (a) the affidavit of GeoSouthern Controller David Post with supporting exhibits, including revenue statements from BBX, a summary of the revenue statements, interest calculations under the Texas Natural Resources Code and Texas Finance Code; (b) GeoSouthern General Land Manager Doug Dahmann's affidavit with supporting exhibits, including the JDAs and JOAs, "Cash Call" letters, well proposal payment chart, GeoSouthern's demand letter, BBX's response to demand letter, Rule 11 Agreement with JOAs and accounting procedures; (c) Kenneth Green's Affidavit with supporting exhibits including fee chart, redacted invoices, and interest calculations; and (d) Blake Hamm's affidavit with supporting exhibits including prior summary judgment orders, orders for issuance of prejudgment writs of garnishment, Laurel Vance's

17

deposition transcript, bankruptcy hearing transcripts, and Murphy Energy Corp. bankruptcy schedules.

In its response to GeoSouthern's final summary judgment motion, BBX contended GeoSouthern failed to prove its breach of contract claim under the Rule 11 Agreement, specifically that GeoSouthern failed to conclusively establish its performance and damages. BBX also argued that GeoSouthern failed to meet the statutory requirements of the TNRC, and BBX had paid GeoSouthern an amount exceeding its initial demand. BBX asserted its entitlement to bring an affirmative claim for damages based on promissory estoppel as a matter of law. Finally, BBX challenged GeoSouthern's right to recover attorneys' fees. Additional evidence BBX included with its response was GeoSouthern General Land Manager Doug Dahmann's Deposition, Laurel Vance's affidavit averring Murphy Energy still had not paid $217,740.96 owed to BBX and attributable to GeoSouthern's revenues, BBX CEO Matthew Telfer's Affidavit regarding the parties' relationships and the JDAs, and BBX's counsel's affidavit challenging the reasonableness and necessity of attorneys' fees.

The trial court granted GeoSouthern's motion for final summary judgment against BBX in its entirety. The trial court declared that neither the "Cash Call" letters nor the JDAs authorized BBX to withhold GeoSouthern's oil and gas revenues nor net/offset revenues owed to GeoSouthern against any non-JIB amounts

18

asserted by BBX, and GeoSouthern had no obligation under the Neches II JDA to pay any pre-development or unproposed well costs in connection with the Turkey Creek Prospect. The trial court ordered that BBX was liable to:

- AFI in the principal amount of EIGHT HUNDRED FORTY-SIX THOUSAND ONE HUNDRED SIXTY-FOUR AND 84/100 U.S. DOLLARS ($846,164.84), plus (i) EIGHTY-ONE THOUSAND NINE HUNDRED AND 95/100 U.S. DOLLARS ($81,900.95) in prejudgment interest under the Texas Finance Code, (ii) ONE HUNDRED SEVENTY-FIVE THOUSAND TWENTY-NINE AND 09/100 U.S. DOLLARS ($175,029.09) in reasonable and necessary attorneys' fees, (iii) an additional TWENTY THOUSAND AND NO/ 100 U.S. DOLLARS ($20,000.00) in reasonable and necessary attorneys' fees if this Final Judgment is appealed and AFI is the successful party, (iv) an additional TWENTY-FIVE THOUSAND AND NO/IOO U.S. DOLLARS ($25,000.00) in reasonable and necessary attorneys' fees if petition is made to the Texas Supreme Court and AFI is the successful party, and (v) post-judgment interest at the rate of five percent (5%) per annum on all foregoing amounts;

- GSEP in the principal amount of ONE HUNDRED EIGHT[Y]-SIX THOUSAND FIVE HUNDRED TWENTY AND 03/100 U.S. DOLLARS ($186,520.03), plus (i) SEVENTEEN THOUSAND FOUR HUNDRED SEVENTEEN AND 94/100 U.S. DOLLARS ($17,417.94) in prejudgment interest under the Texas Finance Code, (ii) Thirty-Eight Thousand Five Hundred Fifty-Nine and 20/100 U.S. Dollars ($38,539.20) in reasonable and necessary attorneys' fees, (iii) an additional TWENTY THOUSAND AND NO/100 U.S. DOLLARS ($20,000.00) in reasonable and necessary attorneys' fees if this Final Judgment is appealed and GSEP is the successful party, (iv) an additional TWENTY-FIVE THOUSAND AND NO/100 U.S. DOLLARS ($25,000.00) in reasonable and necessary attorneys' fees if petition is made to the Texas Supreme Court and GSEP is the successful party, and (v) post-judgment interest at the rate of five percent (5%) per annum on all foregoing amounts;

- GSEC in the principal amount of ONE MILLION SIX HUNDRED TWENTY-SIX THOUSAND SEVEN HUNDRED EIGHTY-EIGHT

19

AND 33/100 U.S. DOLLARS ($1,626,788.33), plus (i) ONE HUNDRED SIXTY-TWO THOUSAND TWO HUNDRED TWENTY-NINE AND 43/100 U.S. DOLLARS in prejudgment interest under the Texas Finance Code, (ii) THREE HUNDRED THIRTY-SIX THOUSAND FOUR HUNDRED SEVENTY-ONE AND 70/100 U.S. DOLLARS ($336,471.70) in reasonable and necessary attorneys' fees, (iii) an additional TWENTY THOUSAND AND NO/100 U.S. DOLLARS ($20,000.00) in reasonable and necessary attorneys' fees if this Final Judgment is appealed and GSEP is the successful party, (iv) an additional TWENTY-FIVE THOUSAND AND NO/100 U.S. DOLLARS ($25,000.00) in reasonable and necessary attorneys' fees if petition is made to the Texas Supreme Court and GSEP is the successful party, and (v) post-judgment interest at the rate of five percent (5%) per annum on all foregoing amounts.

BBX timely appealed the trial court's final summary judgment order.

## II. Standard of Review

We review a trial court's decision to grant summary judgment de novo. *See Shell Oil Co. v. Writt*, 464 S.W.3d 650, 654 (Tex. 2015) (citation omitted). We view the evidence in the light most favorable to the nonmovant. *Id.* (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005)). In doing so, we indulge every reasonable inference and resolve any doubts against the motion. *See City of Keller*, 168 S.W.3d at 824. "Undisputed evidence may be conclusive of the absence of a material fact issue, but only if reasonable people could not differ in their conclusions as to that evidence." *Buck v. Palmer*, 381 S.W.3d 525, 527 (Tex. 2012) (citation omitted).

20

When a no-evidence motion has been filed, it "is essentially a pretrial directed verdict, and we apply the same legal sufficiency standard in reviewing a no-evidence summary judgment as we apply in reviewing a directed verdict." *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750–51 (Tex. 2003) (citations omitted).

> A no evidence point will be sustained when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact.

*Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997) (citation omitted).

A party moving for traditional summary judgment has the burden of establishing there is no genuine issue of material fact as to at least one requisite element of the asserted cause of action and that it is entitled to judgment as a matter of law. *See* Tex. R. Civ. P. 166a(c); *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 45 (Tex. 2017) (citations omitted). When the trial court fails to specify the grounds on which it granted summary judgment, we must affirm if any of the summary judgment grounds are meritorious. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872–73 (Tex. 2000) (citation omitted).

If a defendant files a combined traditional and no-evidence summary judgment motion, we first review the judgment under the no-evidence standards of Rule 166a(i). *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598,

21

600 (Tex. 2004); *Werth v. Johnson*, 294 S.W.3d 908, 909 (Tex. App.—Beaumont 2009, no pet.). When the underlying facts are undisputed, the analysis becomes a question of law for the judge; however, if the facts are disputed, it is a question for the trier of fact. *See Richey v. Brookshire Grocery Co.*, 952 S.W.2d 515, 518 (Tex. 1997).

### III. Analysis

**A. Issue One: Breach of Contract**

In its first issue, BBX challenges GeoSouthern's entitlement to summary judgment on its breach of contract claim. BBX contends that GeoSouthern failed to conclusively establish its damages and that it failed to establish its performance or excuse from performance.

A Rule 11 agreement can be enforced as a contract. *See Ford Motor Co. v. Castillo*, 279 S.W.3d 656, 663 (Tex. 2009) (explaining that "party seeking enforcement of the settlement agreement must pursue a separate claim for breach of contract[]"). To be entitled to traditional summary judgment on its breach of contract claim, GeoSouthern was required to prove all elements of its claim. *See* Tex. R. Civ. P. 166a(c). The essential elements of a breach of contract cause of action are: "(1) the existence of a valid contract; (2) the plaintiff performed or tendered performance as the contract required; (3) the defendant breached the contract by failing to perform or tender performance as the contract required; and (4) the plaintiff sustained

damages as a result of the breach." *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018) (citations omitted).

**1. Damages**

BBX makes three sub-arguments in support of this issue: (1) GeoSouthern employee Dahmann's affidavits were conclusory; (2) GeoSouthern failed to prove its entitlement to additional damages including the "Murphy Amount;" and (3) the damages, as awarded in the final summary judgment order, were not requested in the motion.

As proof of its damages with its first partial motion for summary judgment, GeoSouthern included evidence in the form of an affidavit from Douglas Dahmann. Additionally, the summary judgment evidentiary record included, in part, BBX's Corporate Representative John Gaines's deposition testimony, which BBX submitted with its response. In support of its final motion for summary judgment, GeoSouthern included as evidence another affidavit from Dahmann authenticating and attaching the various JDAs,[10] GeoSouthern's demand letter, the Rule 11 Agreement, BBX's response to the demand letter, and an affidavit from David Post, GeoSouthern's Controller. Post's affidavit authenticated and included revenue

---

[10] The Make My Day JDA in the final summary judgment record included a copy of "A.A.P.L. Form 610-1982 Model Form Operating Agreement Modified to Provide for Horizontal Wells" as well as the COPAS accounting procedures for the JOA.

statements received from BBX, as well as internal GeoSouthern accounting records. These records showed the amounts of monthly revenues owed by BBX to each GeoSouthern entity and the JIB amounts that BBX offset against the revenues. Post's affidavit explained how he used the attached accounting records to calculate the amounts owed to GeoSouthern from BBX.

BBX objected to Dahmann's affidavit and argues Dahmann's testimony regarding damage amounts is conclusory and not supported by documentary evidence or otherwise how he arrived at the damage amounts. In its brief, BBX contends "Mr. Dahmann's affidavit is devoid of means to calculate how GeoSouthern arrives at approximately $2.6M in claimed damages[,]" and "[n]o documents are attached to assist in or verify the calculation."

A conclusory affidavit is substantively defective. *See Brown v. Brown*, 145 S.W.3d 745, 751 (Tex. App.—Dallas 2004, pet. denied). Rule 166a(f) governs affidavits submitted in support of summary judgments and provides as follows:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence . . . [s]worn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions or by further affidavits.

Tex. R. Civ. P. 166a(f).

BBX further disagrees with the amounts set forth in the affidavit of GeoSouthern's Controller, David Post. Post's affidavit attached the revenue

24

statements from BBX, explained what the various amounts in those statements were, and specified how he used those to calculate the amount BBX owed GeoSouthern. BBX does not dispute that it owes and has withheld revenues from GeoSouthern. Despite disagreeing with the amounts claimed to be owed by GeoSouthern, BBX failed to provide any contrary evidence to substantiate the revenue amounts it collected on behalf of GeoSouthern for the months in question.

Even if we agree that Dahmann's affidavit is conclusory as to damage amounts, the trial court may also consider the evidence attached to BBX's summary judgment responses to make its ruling. *See Wilson v. Burford*, 904 S.W.2d 628, 629 (Tex. 1995); *see also Schlumberger Tech. Corp. v. Pasko*, 544 S.W.3d 830, 835 (Tex. 2018) ("Rule 166a(c) plainly provides for the court to consider evidence in the record that is attached either to the motion or response[]"). BBX included the deposition testimony of its corporate representative, John Gaines, as evidence with its response to GeoSouthern's first motion for partial summary judgment. In that deposition, Gaines testified that in October 2016, BBX made the decision to begin netting JIB amounts GeoSouthern owed against the revenues due. Gaines testified that BBX did so pursuant to Article XV, Section D of the JOAs, and the Rule 11 Agreement incorporated the JOAs by reference. Gaines testified that after netting JIB amounts GeoSouthern owed between October 2016 and July 2017 against the revenues BBX owed GeoSouthern, the net revenue amount BBX owed GeoSouthern

25

was $1,714,547.65. Therefore, with respect to damages, the evidence in the first partial summary judgment record conclusively established that as of July 2017, BBX owed GeoSouthern $1,714,547.65 in revenues.

In response to GeoSouthern's motion for final summary judgment, BBX complains that GeoSouthern incorporated the $1,714,547.65 revenue amount from the first motion but failed to account for how the additional amount of $727,184.59 or $944,925.55 was derived. However, Post's affidavit clearly explains that between August 2016 through October 2017, "BBX owe[d] GeoSouthern not less than the total principal amount of $2,659,473.20" or alternatively, if BBX rightfully withheld the "Murphy Oil Payments" from GeoSouthern's revenue in an amount of $217,740.96, then the revenue amount owed GeoSouthern was $2,441,732.24. Post explains how he calculated these "net revenues" with specificity using the revenue statements BBX sent to GeoSouthern. The BBX statements and the summaries contained data for these amounts that included JIB deduction amounts, and Post attached these statements and summaries to his affidavit. BBX complains that the calculations in the affidavits for the motion for final summary judgment did not but should have accounted for JIBs; however, the testimony of BBX's accountant, Laurel Vance, conclusively established that GeoSouthern did not owe any additional JIB payments, because BBX had netted them or offset them against GeoSouthern's

26

revenues, and the "unnetted revenue" remains in BBX's revenue account until the check clears the bank.

"[I]ssues a non-movant contends avoid the movant's entitlement to summary judgment must be expressly presented by written answer to the motion or by other written response to the motion[.]" *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex. 1993) (citing *City of Hous. v. Clear Creek Basin Authority*, 589 S.W.2d 671, 678 (Tex. 1979)). In its response to GeoSouthern's motion for final summary judgment, BBX only disputed that it owed $944,925.55, because it disputed that it owed the "Murphy Amount" of $217,740.96 as it had never received those funds from the purchaser. BBX did not challenge the remaining revenue amounts GeoSouthern claimed. Therefore, to the extent that BBX disputes the revenue amounts owed in the final judgment beyond the "Murphy Amount," BBX failed to address the remaining revenue damages in its summary judgment response. *See id.*

The summary judgment evidence conclusively established the total damage amount of $2,659,473.20, less the amount awarded in the first summary judgment order of $1,714,547.65, totaled $944,925.55, which was the exact amount GeoSouthern claimed to be owed. Evidence in the summary judgment record also supported that the alternate number of $2,441,732.24 was derived by deducting the "Murphy Amount" of $217,740.96, should the trial court determine BBX lawfully

withheld this amount, then subtracting the $1,714.547.65 awarded in the initial summary judgment, totaled $727,184.59. Despite BBX's complaint that there remained a genuine issue of material fact regarding the proper calculation of any damages, the trial court was able to decide as a matter of law whether Murphy Oil's failure to pay BBX by its subsequent bankruptcy excused BBX from including the "Murphy Amount" of $217,740.96 in the revenue calculations from a plain reading of the Rule 11 Agreement.

Finally, BBX argues that GeoSouthern did not request the itemized measure of damages awarded to each separate GeoSouthern entity in the final summary judgment order. Generally, a judgment for damages exceeding the pleaded amount is erroneous, even when the evidence supports a larger award. *Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 202 (Tex. 2001); *see also* Tex. R. Civ. P. 301 (requiring judgment to conform to pleadings); *Garrett v. Brinkley*, No. 03-17-00295-CV, 2017 WL 6503043, at *2 (Tex. App. —Austin Dec. 12, 2017, pet. denied) (mem. op.) (explaining how the rule developed). However, when appellate courts have reversed summary judgments because a trial court granted more relief than a party requested in its motion for summary judgment, the summary judgment motion "wholly failed to address a claim for relief or theory of liability." *Levertov v. Hold Props., Ltd.*, No. 11-11-00284-CV, 2014 WL 887225, at *5–6 (Tex. App.—Eastland Feb. 27, 2014, no pet.) (mem. op.) (affirming summary judgment granting damages for more

28

months' rent than specifically requested in motion where evidence supported award, body of motion referenced more months than specifically requested in prayer) (citing *Science Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911–12, (Tex. 1997); *Bever Props., L.L.C. v. Jerry Huffman Custom Builder, L.L.C.*, 355 S.W.3d 878, 886–87 (Tex. App.—Dallas 2011, no pet.); *Rust v. Tex. Farmers Ins. Co.*, 341 S.W.3d 541, 552 (Tex. App.—El Paso 2011, pet. denied); *Muston v. Nueces Cty. Sheriff's Dep't*, 122 S.W.3d 469, 473 (Tex. App.—Corpus Christi 2003, no pet.)).

BBX has failed to cite any cases, nor have we found any, where an appellate court reversed a trial court for awarding the amount of damages sought in a summary judgment motion but itemized the damage awards among the various plaintiff movants, who were related entities. Here, GeoSouthern identified the three separate entities as Plaintiffs, AFI, GSEP, and GSEC in its summary judgment motion, which it collectively referred to as "GeoSouthern." It incorporated the trial court's prior partial summary judgment award to GeoSouthern in the amount of $1,714,547.65 through July 31, 2017. GeoSouthern asserted the entities were owed total additional revenues of $944,925.55 between August 2017 through January 2018 if the trial court determined as a matter of law that BBX improperly withheld the "Murphy Amount" or alternatively, $727,184.59 if BBX was excused from including the "Murphy Amount" in revenue payments. The evidence in the form of Post's affidavit, supporting revenue statements, and summaries expressly enumerated the

29

revenue amounts owed to each GeoSouthern entity and supported the exact amount of revenues awarded by the trial court, which importantly, BBX does not contest. BBX only disputes that the "Murphy Amount" should be included in the revenue payments. Finally, in its summary judgment motion prayer, GeoSouthern sought "such other and further relief to which they show themselves justly entitled." GeoSouthern conclusively established its damages, and the summary judgment evidence supports the trial court's delineation of the amounts owed to each Plaintiff.

### 2. Performance

On appeal, BBX argues that GeoSouthern failed to prove it performed under the contract or that its performance was excused and that BBX asserted the affirmative defense of prior material breach. Only a party's material breach will excuse the other contracting party's performance. *See Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994); *see also Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 196 (Tex. 2004) ("It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance."). "Generally, the issue of whether a breach rises to the level of a material breach that will render the contract unenforceable presents a dispute for resolution by the trier of fact." *Hiles v. Arnie & Co, P.C.,* 402 S.W.3d 820, 831 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (citation omitted). However,

materiality of a breach and the agreement's resulting unenforceability can present questions for the court to resolve as a matter of law. *See id.*; *see also Mustang Pipeline Co.*, 134 S.W.3d at 199–200 (determining that when contract provided time was of the essence and a party failed to perform, other party's performance was excused as a matter of law).

In determining the materiality of a breach, courts consider, among other factors, the extent to which the nonbreaching party is deprived of the benefit it could have reasonably expected from the other party's full performance. *Hernandez*, 875 S.W.2d at 693. "The less the non-breaching party is deprived of the expected benefit, the less material the breach." *Id.* at 693.

BBX's corporate representative admitted that GeoSouthern paid JIB amounts on wells where there was no lien and only withheld JIB amounts on those properties which had a lien filed by a subcontractor. The same corporate representative testified that BBX netted GeoSouthern's JIB amounts against the revenues and the "JIBs are now current as a result of the cumulative netting." The summary judgment record likewise established that BBX's accountant testified GeoSouthern was current on their JIB amounts and owed no further JIBs because BBX had netted or offset against all JIB amounts owed.

In the Rule 11 Agreement, the parties agreed to pay the JIBs and revenues in a manner consistent with the JOAs but set forth a monthly deadline by which BBX

31

had to pay the prior month's revenues. GeoSouthern does not dispute BBX's right to net or offset JIB payments against revenues. The JOAs contained a provision allowing BBX to offset or net late JIB payments owed to them against revenues due the working interest owner. Since the Rule 11 Agreement required JIBs to be paid in accordance with the JOAs, the remedy of offsetting or netting those amounts owed to BBX against the revenues due to GeoSouthern was a remedy available and one BBX exercised to make itself whole with respect to the JIBs. GeoSouthern conclusively established that the summary judgment evidence showed BBX netted the entire JIB amounts against GeoSouthern's revenues, it no longer owed any JIB amounts, and therefore, BBX received the benefit of the bargain. BBX presented no evidence establishing a genuine issue of material fact existed as to the materiality of any alleged breach by GeoSouthern to the extent it failed to pay JIBs on liened properties. Therefore, BBX was still required to pay revenue amounts owed under the contract.

Having determined that GeoSouthern conclusively established its damages and BBX failed to present evidence creating a genuine issue of material fact as to the materiality of a breach, we overrule BBX's first issue.

**B. Issue Two: Declaratory Judgment**

BBX challenges the trial court's entry of declaratory judgment for GeoSouthern and specifically contests "that certain agreements [did] not authorize BBX to net or offset revenues." BBX argues GeoSouthern failed to establish as a matter of law its entitlement to a declaratory judgment that BBX is not allowed to net or offset revenues, therefore the burden never shifted to it to show the existence of a material fact issue exists. BBX claims that it pleaded the affirmative defenses of usage and trade and recoupment, and even if the burden shifted, it presented evidence that every other working interest owner paid or agreed to pay the prospect development costs. BBX further asserts that GeoSouthern failed to bring forth any evidence other than the agreements and Dahmann's affidavit, which BBX maintains is conclusory.

GeoSouthern pleaded claims for declaratory judgment pursuant to Texas Civil Practice and Remedies Code Chapter 37 and sought among other things, declarations:[11] (1) "determining amounts lawfully owed under the Subject Contracts and Rule 11 Agreement, including production revenues, JIBs, Unproposed Well

---

[11] GeoSouthern's fourth amended petition contained the same claims for declaratory relief as the third amended petition. The third amended petition was the live pleading when it filed its first motion for partial summary judgment, and the fourth amended petition was the live pleading when GeoSouthern filed its motion for final summary judgment, which incorporated the trial court's rulings from the first summary judgment.

33

Costs and related charges. Such determination should also include an accounting of all amounts billed and paid by GeoSouthern, including cash call prepayments;"[12] (2) "an election by AFI to go non-consent on BBX's Turkey Creek Well Proposal under the Neches II AMI Agreement results in no obligation for AFI to pay the Unproposed Well Costs for that prospect, and specifically that AFI did elect to go non-consent on the Turkey Creek Well Proposal and therefore has no obligation to pay either Unproposed Well Costs or Well AFE[;]" (3) "[t]he AMI Agreements, Rule 11 Agreement and Subject Contracts do not authorize BBX to withhold revenue payments, offset or net against revenue payments in connection with the Unproposed Well Costs. To the extent BBX has limited authority under the JOAs to offset/net JIBs against revenue payments (as opposed to Unproposed Well Costs), such authority is limited to offsetting/netting for specific JIB charges owed under the applicable joint operating agreement against revenue payments from wells governed by such joint operating agreement."

When a cause of action seeks a declaratory judgment of a contract's construction, the only evidence of the contract's interpretation may be the contract itself. *See Piranha Partners v. Neuhoff*, 596 S.W.3d 740, 743–44 (Tex. 2020) (an unambiguous contract's meaning is determined as a matter of law, looking to the

---

[12] GeoSouthern's petitions defined "Subject Contracts" as "certain joint operating agreements and related development agreements" between GeoSouthern and BBX.

parties' intent as expressed in the written agreement); *IE.Com Ltd. v. Peeler*, No. 05-19-00496-CV, 2020 WL 3424913, at *3 (Tex. App.—Dallas June 23, 2020, no pet.) (mem. op.) (noting that in a declaratory action regarding contract construction, the only evidence may be the contract itself). No party asserts that the Subject Contracts are ambiguous. With its first motion for partial summary judgment, GeoSouthern included the relevant JDAs and Rule 11 Agreement, "Cash Call" letters, BBX's Turkey Creek Well Proposal dated August 2015, and AFI's election to "go non-consent" in response to the Turkey Creek Well Proposal. With its motion for final summary judgment, GeoSouthern included these same documents and the JOAs. In the absence of any claim of ambiguity, these contracts alone can conclusively establish the parties' rights. *See Piranha Partners*, 596 S.W.3d at 743–44. The construction of an unambiguous contract is a question of law for the court. *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011). When discerning the parties' intent, we examine the entire agreement, giving effect to each provision so that none is rendered meaningless. *See id.*

GeoSouthern requested that the trial court determine the parties' rights under the Subject Contracts and Rule 11 Agreement. The "Cash Call" letters indicate they were sent under the Make My Day JDA and Neches II AMI Agreements, respectively. The applicable provisions in these agreements make clear that they governed the parties' relationships before a JOA came into place and that to the

35

extent the JOA was inconsistent with the Make My Day JDA or the Neches II JDA, the JDAs would supersede.

The Neches II JDA, the agreement covering the Turkey Creek Well Proposal, addressed leasehold acquisitions and well proposals in a defined area. The Neches II JDA did not limit leasehold acquisitions to BBX. Instead, any party to the agreement could be an acquiring party, and while the agreement required "acquiring parties" to complete title and curative work, the agreement also stated that the parties to the agreement "shall have the right to participate in any acquisitions within the AMI[.]" With respect to leasehold acquisitions, the Neches II required the acquiring party to give written notice within thirty (30) days of completing such acquisition to the other parties and provide them with a "complete description of the Lease(s) or Farmout Agreement(s) acquired and a copy of the Instrument(s) by which such interest was acquired and all other pertinent information, including the number of gross and net lease acres, *the costs incurred* in making the acquisition . . . ." (Emphasis added.) The contract further provides that "*[i]f the election is to participate* in the purchase of a Lease, *the notice of election shall be accompanied by a check for the cost* of the proportionate interest such Party elects to take based upon the costs specified in the original notice." (Emphasis added.) The clear and unambiguous language of the agreement provides for the parties' right to participate by way of election. The conditional language makes clear that sending a check for

36

the proportionate share of costs was to occur if the party elected to participate. The contract notes that the parties shall have the "right" to participate rather than the "obligation" to participate. The Neches II AMI also provided a consequence for parties electing not to participate in leasehold acquisitions: a party's "[f]ailure to timely deliver a written election to purchase (and payment) or to participate will constitute a conclusive relinquishment of the right to acquire an interest in the Lease[.]" Pursuant to the Neches II JDA Well Proposals likewise could be submitted by any party and gave the parties the right to "elect" to participate.

Unlike the Neches II, the Make My Day JDA provided that BBX "will have the sole option to propose units and wells in the defined areas[]" and that "[w]ell proposals will be proposed under the terms and conditions of section B of this Agreement and shall be governed by the terms of the JOA attached hereto and made a part hereof as Exhibit B." The Make My Day JDA also required written notice of well proposals and "such notice will contain the surface location of the well, the objective depth of the well and an estimate of the cost of drilling and completing the well for production." The Make My Day JDA stated as follows:

> The parties receiving the Initial Well proposal shall have thirty (30) days after receipt of the proposal to notify the proposing party, in writing, whether they elect to participate in the cost of the Initial Well ("Participating Parties") or elect to relinquish their interest in the proposed well, and all future well(s) proposals, along with rights to any future leasehold purchased, within the proposed unit area. All parties electing to participate in the Initial Well will immediately execute and return the Operating Agreement provided in the proposal. If one (1) or

37

more Parties elect not to participate in the Initial Well, then the proposing party shall give written notice of same to those Participating Parties within twenty (20) days following the expiration of the thirty (30) day election period set forth above. The Participating Parties shall then have the option for ten (10) days, following receipt of such written notice to elect to participate for their proportionate share of the interest available.

With respect to leasehold acquisitions, the Make My Day JDA provided that any interest[13] acquired by any party within the defined AMI "shall be offered to the other Parties" to the agreement. Further,

[t]he Party acquiring any such Interest ("Notifying Party") shall notify the other Parties ("Receiving Parties") in writing within 30 days of completing such acquisition and shall provide the Receiving Parties with a Lease Purchase Report containing a complete description of the Lease(s) acquired or a copy of the Farmout Agreement entered into, including the number of gross and net lease acres, the costs incurred in making the acquisition, the amount of any known overriding royalties or other existing lease burdens affecting the Interest, the obligations associated with or required to earn such Interest, a mineral ownership report, and a copy of any agreements(s) by which the Leases were acquired, including the Oil and Gas Lease, filed Memorandum of Oil and Gas Lease, and any electronic shape files or other plat identifying the acquisition. For thirty (30) days from receipt of notice, the Receiving Parties *shall have the right* to acquire their Participating Interest (hereinafter defined) share in such Leases(s) or Farmout Agreement by providing written notice to the Notifying Party within such 30 day period accompanied by a check or wire transfer to the Notifying Party's bank account for the cost of all of its Participating Interest based upon the costs specified in the original notice. If the election to participate in a Farmout Agreement is made by any of the Receiving Parties, it shall send its notice of election to the Notifying Party and shall include an agreement to assume and be bound by the obligations imposed by the Farmout Agreement to the extent of all of the Receiving Parties' Participating Interests. Failure to timely deliver

---

[13] Interest was defined as "Leases" in Section C of the agreement.

a written election to purchase or to participate as required above or the failure to pay for the cost of the Participating Interest at the time the written election is delivered will constitute a conclusive relinquishment of all of the right to acquire an interest in the Lease or to participate in the Farmout Agreement.

(Emphasis added.)

We are cognizant that our primary concern is to give effect to the parties' intent as expressed in the contract by considering the entire agreement and harmonizing all provisions so none are rendered meaningless. *See Seagull Energy E&P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006). To adopt BBX's position would render these election provisions meaningless. *See id.* The JDAs provided consequences of non-participation or non-consenting to leasehold acquisitions or drilling, whether that non-consent was an affirmative written election or a deemed non-consent for failure to timely provide a written election to consent. The express and clear consequence provided in these agreements did not include BBX's offsetting or netting revenues, rather the consequence was the loss of the party's right to participate in future drilling or leasehold acquisitions under the agreements. *See id.* (explaining that dispute under a JOA turned on whether the parties expressly agreed upon consequences of election). Even though BBX sent the "Cash Call" letters with express language citing the JDAs, BBX creatively attempted to carve out the costs from the agreements by calling them "prospect development costs." The "Cash Call" letters also stated that if the GeoSouthern entity elected not

to pay their share of expenses, they will be deemed to have elected not to participate in future drilling or leaseholds. This was consistent with the language contained in the Subject Contracts that the consequence for electing not to pay the costs resulted in a forfeiture of the right to participate in future drilling or leasehold acquisition rather than BBX having the right to withhold, net, or offset revenues from already producing wells. Finally, the Rule 11 Agreement unconditionally required BBX to pay GeoSouthern its revenues and was devoid of any mention of "Cash Call" costs.

BBX contends on appeal that it pleaded usage of trade and recoupment, and the fact that all other working interest owners agreed to pay the "Cash Call" costs created a fact issue. "[W]hen a contract is unambiguous, we do not consider outside evidence, including industry custom and usage, to alter or contradict the terms." *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 486 (Tex. 2019) (citing *URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 757-58 (Tex. 2018); *Nat'l Union Fire Ins. of Pittsburgh v. CBI Indus., Inc.*, 907 S.W.2d 517, 520-21 (Tex. 1995) (per curiam)). Likewise, an unambiguous contract silent as to an immaterial, non-essential term, requires no further supplementation. *Id.* We decline to supplement clear and easily understood provisions with extrinsic evidence. *See id.*

We overrule this issue.

40

## C. Issue Three: Quantum Meruit and BBX's Expenses

BBX argues that the trial court erred by granting summary judgment in favor of GeoSouthern regarding BBX's quantum meruit claim for prospect development costs. BBX contends that GeoSouthern failed to meet its summary judgment burden to prove its affirmative defense of express contract. BBX asserts that the trial court erred by concluding the Neches II and Make My Day JDAs expressly addressed recovery of the expenses sought.

A party may plead breach of contract and quantum meruit as alternate theories of recovery. *See* Tex. R. Civ. P. 48. Generally, though, the existence of an express contract covering the subject matter of the dispute precludes recovery in quantum meruit. *See In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 740 (Tex. 2005); *see also Hill v. Shamoun & Norman, LLP*, 544 S.W.3d 724, 733 (Tex. 2018).

"Whether an express contract covers the services at issue is a legal question for the court." *Young v. Dimension Homes, Inc.*, No. 01-14-00331-CV, 2016 WL 4536407, at *3 (Tex. App.—Houston [1st Dist.] Aug. 30, 2016, no pet.) (citation omitted). If the evidence shows that no contract covers the services at issue, then the question of the party's recovery in quantum meruit is for the trier of fact. *See Gulf Liquids New River Project, LLC v. Gulsby Eng'g, Inc.*, 356 S.W.3d 54, 70 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

41

In addition to the written JDAs, GeoSouthern submitted BBX's "Cash Call" letters for unproposed development costs in support of its motion for summary judgment. The "Cash Call" letters contained language that either of the applicable JDAs "allows BBX Operating LLC to Cash Call partners for the expenses incurred for brokers fees, title examination, title curative and other expenses incurred for preparing tracts of land to be included in a future Drilling Unit(s)." The evidence supporting GeoSouthern's second motion for partial summary judgment also included Gaines's deposition testimony. Gaines testified that the prospect development costs or unproposed well costs "are owed pursuant to the underlying AMI agreements as costs that were incurred by BBX Operating on behalf of the non-op partners primarily for title, curative – title examination, curative expenses."

This evidence established that BBX's representatives sent the "Cash Calls" pursuant to the express contracts. Most importantly, the plain language of the agreements covered the services that BBX tried to recover via "Cash Calls." Those agreements unequivocally contained election provisions whereby the working interest owners could choose to participate in the costs, and if so, they reaped the rewards when a well produced. Their election not to participate resulted in the consequence of forfeiture of future participation rights.

The summary judgment record supports the trial court's determination that GeoSouthern conclusively established that the Neches II and Make My Day JDA

42

contracts expressly covered the services at issue and therefore, barred BBX's quantum meruit recovery.[14] *See Fortune Prod. Co. v. Conoco, Inc.,* 52 S.W.3d 671, 684–85 (Tex. 2000) (no recovery under a quasi-contract or unjust enrichment theory where valid express contract covers the subject matter of parties' dispute). We overrule BBX's third issue.

## D. Issue Four: Dismissal of BBX's Counterclaim for Promissory Estoppel

BBX advances several arguments challenging the trial court's dismissal of its promissory estoppel claim, which GeoSouthern affirmatively addressed in its final motion for summary judgment. For the reasons explained above, the JDAs were express contracts covering the subject matter of the "Cash Call" costs sought by BBX and expressly provided for therein. If a valid contract covers the alleged promise, the plaintiff cannot recover for the promise under promissory estoppel. *Fertic v. Spencer*, 247 S.W.3d 242, 250 (Tex. App.—El Paso 2007, pet. denied); *see also Subaru of Am., Inc. v. David McDavid Nissan, Inc.,* 84 S.W.3d 212, 226 (Tex. 2002) (promissory estoppel doctrine presumes no contract exists); *Fortune Prod. Co.,* 52 S.W.3d at 684 (Tex. 2000). BBX's promissory estoppel claim is barred as a matter of law because an express contract governs the subject matter of the parties' dispute. We overrule issue four.

---

[14] Having concluded express contracts cover the services at issue, thus barring recovery under this theory, we do not address the evidence of the individual quantum meruit elements. *See* Tex. R. App. P. 47.1.

**E. Issue Five: TNRC Claim**

In its fifth issue, BBX contends that GeoSouthern failed to prove its Texas Natural Resource Code claim as a matter of law. Texas Natural Resource Code sections 91.402 and 91.403 require a payor of oil and gas revenues to pay interest to the payee if the revenue payments are not paid timely. *See* Tex. Nat. Res. Code Ann. § 91.402(a) (requiring timely payment), § 91.403(a) (requiring payment of interest); *Valence Operating Co. v. Anadarko Petroleum Corp.*, 303 S.W.3d 435, 445 (Tex. App.—Texarkana 2010, no pet.) (discussing Texas Natural Resources Code provisions governing timely payment of revenues). Pre-suit notice is a condition precedent to instituting a legal action under these provisions. *See id.* § 91.404(a) (requiring written notice as a prerequisite to beginning judicial action against nonpayor for nonpayment).

BBX seems to complain about the adequacy of GeoSouthern's pre-suit notice and that the Rule 11 Agreement was insufficient evidence to establish GeoSouthern's entitlement to revenue payments under the statute. BBX further argues that it has raised a fact issue about whether GeoSouthern's demand was satisfied by the Rule 11 Agreement or by BBX's payment of the amounts owed in satisfaction of the demand.

GeoSouthern's summary judgment evidence included a December 2015 letter sent to BBX wherein it notified BBX of non-payment of revenues that BBX had

44

wrongfully withheld and cited to the pertinent Texas Natural Resource Code provisions. GeoSouthern subsequently filed suit to collect those revenues. The summary judgment evidence also included the executed Rule 11 Agreement wherein BBX agreed to pay revenues it owed GeoSouthern on a specific timeline. BBX's argument that because GeoSouthern agreed to accept an amount different than the demand letter and BBX's payment of a portion of the revenues precluded the recovery under the Texas Natural Resources Code lacks merit. The evidence shows that while BBX may have paid an initial sum that addressed the amounts of revenues when GeoSouthern sent the demand, BBX had an ongoing obligation to pay revenues pursuant to the Rule 11 Agreement on a set schedule. Despite making an initial payment, BBX's corporate representative admitted BBX continued to withhold revenues after the parties entered into the Rule 11 Agreement. Moreover, the evidence established the prejudgment interest amount GeoSouthern sought was limited to those additional revenue amounts that BBX had not paid and was consistent with the Principal Amount of $2,659,473.20. We overrule this issue.

## F. Issue Six: Prejudgment Interest

In its sixth issue, BBX challenges the trial court's award of prejudgment interest. In its motion for final summary judgment, GeoSouthern moved for prejudgment interest under Texas Finance Code section 302.002 and Texas Natural Resources Code section 91.403(a). *See* Tex. Fin. Code Ann. § 302.002; Tex. Nat.

Res. Code Ann. § 91.403(a). The trial court awarded prejudgment interest at a rate of six percent pursuant to Texas Finance Code section 302.002.[15] BBX argues a question of fact existed regarding the "Murphy Amount," which put the total principal amount in question, and therefore, GeoSouthern failed to conclusively establish its entitlement to prejudgment interest on any theory.

As explained above, the trial court decided as a matter of law whether BBX lawfully withheld the "Murphy Amount" by interpreting the Rule 11 Agreement and the applicable JDAs. The trial court determined BBX improperly withheld the "Murphy Amount," and the Subject Principal Amount of $2,659,473.20 was readily ascertainable given the summary judgment evidence. GeoSouthern provided prejudgment interest calculations in Post's affidavit with supporting documentation including the "Murphy Amount" and without the "Murphy Amount." The prejudgment interest calculation did not include the initial amount BBX paid pursuant to the Rule 11. Rather, the calculation only included the amounts for the payment of ongoing revenues BBX failed to pay.

---

[15] A Texas Natural Resources Code claim allows a payee to recover prejudgment interest. *See* Tex. Nat. Res. Code Ann. § 91.403(a). In its brief, BBX incorrectly states that the trial court awarded pre-judgment interest under both the Texas Natural Resources Code and the Finance Code, in the alternative. This is incorrect. Although the trial court's Order noted that GeoSouthern was entitled to prejudgment interest at the rate of six percent under the Texas Finance Code section 302.002 and, in the alternative, the rates specified under Texas Natural Resources Code section 91.403, the trial court only *awarded* pre-judgment interest at the Finance Code rate of six percent. *See* Tex. Fin. Code Ann. § 302.002.

Texas Finance Code section 302.002 provides as follows:

> If a creditor has not agreed with an obligor to charge the obligor any interest, the creditor may charge and receive from the obligor legal interest at the rate of six percent a year on the principal amount of the credit extended beginning on the 30th day after the date on which the amount is due. If an obligor has agreed to pay to a creditor any compensation that constitutes interest, the obligor is considered to have agreed on the rate produced by the amount of that interest, regardless of whether that rate is stated in the agreement.

Tex. Fin. Code Ann. § 302.002. The Texas Finance Code defines "creditor" as "a person who loans money or otherwise extends credit. The term does not include a judgment creditor." *Id.* § 301.002(a)(3). A "loan" is defined as "an advance of money that is made to or on behalf of an obligor, the principal amount of which the obligor has an obligation to the pay the creditor. The term does not include a judgment." *Id.* § 301.002(a)(10). An obligor is "a person to whom money is loaned or credit is otherwise extended. The term does not include . . . a judgment debtor[.]" *Id.* § 301.002(a)(13); *see Smith v. Huston*, 251 S.W.3d. 808, 827–28 (Tex. App.—Fort Worth 2008, pet. denied) (discussing statutory definitions and applicability of 302.002). The summary judgment record in this case does not include any evidence establishing that GeoSouthern is a creditor as that term is defined in the Finance Code, that it loaned money to BBX, or that BBX had credit extended to it by GeoSouthern. The trial court erred by awarding prejudgment interest under Texas Finance Code section 302.002 at a rate of six percent pursuant

when the evidence did not establish that GeoSouthern met the statutory definition of a creditor.

GeoSouthern pleaded in the alternative that it was entitled to prejudgment interest pursuant to Texas Natural Resources Code section 91.403. *See* Tex. Nat. Res. Code Ann. § 91.403(a). Although the trial court did not award prejudgment interest under Texas Natural Resource Code, the trial court determined, in the alternative, that GeoSouthern established its entitlement to prejudgment interest in accordance with that provision. The Texas Natural Resources Code requires that

> "proceeds derived from the sale of oil or gas production from an oil or gas well located in this state . . . must be made to each payee on a timely basis according to the frequency of payment specified in a lease or other written agreement between payee or payor."

*See* Tex. Nat. Res. Code Ann. § 91.402(a). The Rule 11 Agreement expressly provided that BBX agreed to pay the previous month's revenues by the 25th day of each month, which it failed to do. *See id.* BBX's failure to pay the revenues in a timely manner entitled GeoSouthern to the recovery of prejudgment interest at the specified statutory rate. *See id.* § 91.403(a). As explained elsewhere in this opinion, BBX does not contest that it owed GeoSouthern revenues or that it failed to pay these revenues. Moreover, the trial court determined as a matter of law that BBX improperly withheld the "Murphy Amount." GeoSouthern is entitled to prejudgment interest as specified in the Texas Natural Resources Code.

We sustain issue six as it applies to the recovery of prejudgment interest under Texas Finance Code section 302.002 but overrule it with respect to recovery of prejudgment interest pursuant to Texas Natural Resource Code section 91.403.

## G. Issue Seven: Attorney's Fees

In its final issue, BBX challenges the trial court's award of attorney's fees.[16] GeoSouthern moved for summary judgment on the issue of attorney's fees, requesting the total amount of $550,060, which the trial court awarded by splitting it among the three GeoSouthern entities based upon the Principal Amount awarded to each. The trial court also awarded conditional attorney's fees in the event BBX appealed.[17] The trial court's order further reflected that GeoSouthern was entitled to recovery of "reasonable and necessary" attorney's fees from BBX pursuant to Texas Civil Practice and Remedies Code Chapter 37 and Texas Natural Resources Code section 91.406. In support of this issue, BBX asserts that: (1) a fact issue exists as to the reasonableness of the amount of attorneys' fees; (2) since it is a limited liability company, no attorneys' fees can be awarded against it pursuant to Texas Civil

---

[16] BBX's controverting affidavit does not mention the anticipated fees awarded in the event of an appeal, and those fees remain uncontested. *See Cammack the Cook, L.L.C. v. Eastburn*, 296 S.W.3d 884, 895 (Tex. App.—Texarkana 2009, pet. denied) (noting failure to mention anticipated fees awarded in the event of an appeal meant "those fees remain uncontested").

[17] Although the Order indicated that GeoSouthern was entitled to the $550,060 in "reasonable and necessary" fees, the individual amounts the trial court awarded to the three entities totaled $550,039.99.

49

Practice and Remedies Code chapter 38; (3) "a declaratory judgment plea does not transform an unviable Chapter 38 claim for attorneys' fees into a viable one[;]" and (4) the trial court erred in awarding attorneys' fees under the Texas Natural Resources Code for the same reasons damages are not recoverable.

Texas follows the American Rule, which provides that a prevailing party has no inherent right to recover attorney's fees from the non-prevailing party absent specific statutory or contractual authority allowing it. *See Rohrmoos Venture v. UTSW DVA Healthcare LLP*, 578 S.W.3d 469, 487 (Tex. 2019); *In re Nat'l Lloyds Ins. Co.*, 532 S.W.3d 794, 809 (Tex. 2017) (orig. proceeding).

> [T]o secure an award of attorney's fees from an opponent, the prevailing party must prove that: (1) recovery of attorney's fees is legally authorized, and (2) the requested attorney's fees are reasonable and necessary for the legal representation, so that such an award will compensate the prevailing party generally for its losses resulting from the litigation process.

*Rohrmoos Venture*, 578 S.W.3d at 487.

### 1. Authorization for Attorney's Fees

At issue in this case is statutory authorization for attorney's fees. Texas Natural Resources Code section 91.406 provides that for suits filed under that subchapter, "the court shall include in any final judgment in favor of the plaintiff an award of . . . reasonable attorney's fees." Tex. Nat. Res. Code Ann. § 91.406(1). GeoSouthern filed a claim pursuant to this subchapter, and this provision provides the statutory authority for recoupment of GeoSouthern's reasonable attorney's fees.

50

*See id.* The use of "shall" indicates that such an award is required should the plaintiff receive a judgment in its favor, as GeoSouthern did here. *See id.*

GeoSouthern filed for a declaratory judgment seeking interpretation of the parties' written agreements and responsibilities thereunder, including the JDAs and Rule 11 Agreement. The trial court entered judgment in GeoSouthern's favor and determined GeoSouthern was entitled to its reasonable attorney's fees pursuant to Texas Civil Practice and Remedies Code Chapter 37. Under the Uniform Declaratory Judgment Act, "the court may award costs and reasonable and necessary attorney's fees as are equitable and just." Tex. Civ. Prac. & Rem. Code Ann. § 37.009. To be entitled to recover fees under the UDJA, "[t]he declaratory judgment claim must do more 'than merely duplicate the issues litigated' via the contract or tort claims." *Etan Indus., Inc. v. Lehmann*, 359 S.W.3d 620, 624 (Tex. 2011) (quoting *MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 669 (Tex. 2009)). In other words, where a claim for declaratory relief is merely "tacked onto" other claims that do not allow for the recovery of fees, permitting the recovery of fees pursuant to the UDJA would defeat the rule that specific provisions prevail over general. *See id.*

Here, we cannot say that GeoSouthern's claims for declaratory relief simply repleaded its breach of contract action. Although the issues were intertwined, GeoSouthern's breach of contract claim dealt with the recovery of its revenues,

which necessarily implicated BBX's offsetting JIB amounts, whereas the claims for declaratory relief primarily dealt with the questionable "Cash Calls" for "prospect development" or "unproposed well costs." In theory, those declarations resolve BBX's ability to rightfully net or offset those amounts against revenues and the viability of BBX's counterclaims for breach of contract. Moreover, GeoSouthern's Texas Natural Resources claim for revenue payments permitted the recovery of attorney's fees. Thus, the claims were not merely "tacked onto" other claims that did not permit recovery of fees.

The trial court correctly concluded that Texas Natural Resources Code section 91.406 and Texas Civil Practice and Remedies Code section 37.009 statutorily authorized GeoSouthern to recover attorney's fees.[18]

**2. Reasonableness**

We next determine whether such fees were reasonable. BBX contends a fact issue exists as to the reasonableness of the fees. The reasonableness of attorney's fees is generally a fact question. *See, e.g., Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998). However, it is settled that "the affidavit of the attorney representing a claimant constitutes expert testimony that will support an award of attorney's fees in a summary judgment proceeding." *Haden v. David J. Sacks, P.C.*, 332 S.W.3d

---

[18] As the trial court's final Order does not reflect that such fees were recoverable pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code, we do not address this issue. *See* Tex. R. App. P. 47.1.

503, 513 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *Tesoro Petroleum Corp. v. Coastal Refining & Mktg., Inc.*, 754 S.W.2d 764, 767 (Tex. App.—Houston [1st Dist.] 1988, writ denied). If a movant presents expert testimony in support of attorney's fees, the burden shifts to the non-movant to raise a fact issue. *Jordan v. Centerpoint Energy Hous. Elec., LLC*, No. 14-18-00663-CV, 2019 WL 5565978, at *10 (Tex. App.—Houston [14th Dist.] Oct. 29, 2019, pet. denied) (mem. op.). Absent controverting evidence, the movant's affidavit will support summary judgment. *Id.*; *Tesoro*, 754 S.W.2d at 767. "If an attorney's affidavit regarding fees is properly controverted by an opposing attorney, a fact issue is raised on reasonableness and summary judgment is precluded." *Sun Tec Computer, Inc. v. Recovar Grp., LLC*, No. 05–14–00257–CV, 2015 WL 5099191, at *5 (Tex. App.— Dallas Aug. 31, 2015, no pet.) (mem. op.); *see also Jordan*, 2019 WL 5565978, at *10.

GeoSouthern's summary judgment evidence supporting its request for attorneys' fees included the affidavit of GeoSouthern's attorney, along with itemized billing records and invoices. He explained his experience, his familiarity with the case and subject matter, the hourly rate charged explaining that it was reasonable considering the location and subject matter of the litigation. He also described the various claims in the litigation, the tasks performed, and the billing records showed who worked on what tasks, how long each worked on the task, and the hourly rate

each charged. He outlined the lodestar factors and averred he considered them in determining the reasonable hourly rate. *See El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 761-63 (Tex. 2012) (discussing lodestar method). He also averred the total number of hours reasonably worked on the litigation and that $550,060 was a reasonable fee for the work performed.[19] The billing records also specified with great particularity the individual tasks performed, the length of time each took, the person working on the task, and the rate of the billing individual.

To constitute competent summary judgment evidence, an affidavit must be based on personal knowledge, set forth facts that would be admissible in evidence, and affirmatively show the affiant's competence to testify as to the matters contained therein. Tex. R. Civ. P. 166a(f). BBX's counsel included a controverting affidavit in its summary judgment response. BBX's attorney described his qualifications, experience, and stated he knew the history of the case. He also averred that it was his opinion that GeoSouthern's fees were not reasonable and necessary. Although he did not specifically contest the reasonableness of the $350 hourly rate, the affidavit contained testimony that the total sum of $550,060 was unreasonable given the causes of action involved. As a basis for this, BBX's attorney averred that the

---

[19] While the affidavit stated GeoSouthern's attorneys spent more than 2,000 hours working on the file, the affidavit also stated that "1,571.6 hours is a reasonable amount of time for attorneys providing similar services to have spent[]" and multiplied that by a "reasonable hourly" rate of $350, which provided the $550,060 figure.

billing invoices of GeoSouthern's attorney contained duplicative entries and wholly unnecessary entries. He testified that

> [n]othing incurred evaluating, analyzing or conducting research on any claims for relief by BBX was reasonable or necessary to pursue any claims by GeoSouthern. Nothing pertaining to Trinity River Resources' bankruptcy proceeding or dealings with any party's bankruptcy counsel was reasonably or necessarily incurred to prosecute a breach of contract, declaratory judgment action or claim under the TNRC. Nothing incurred pursuing the separate garnishment action was reasonable or necessary to pursue the claims in this case.

Finally, BBX's counsel averred that the number of depositions taken in the case was less "compared to most cases that have lasted this long."

The controverting affiant noted his legal experience generally and his experience with this specific case. Likewise, he averred the statements were based on his personal knowledge. Although he did not point to specific time entries, he based his dispute regarding the reasonableness of GeoSouthern's fee on particular tasks GeoSouthern performed and challenged whether they advanced GeoSouthern's claims. The expert's specific complaint that tasks performed defending BBX's counterclaims are unavailing as a matter of law. *See, e.g., Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 314 (Tex. 2006) (explaining that some recoverable and non-recoverable tasks are so intertwined as a matter of law that they cannot be segregated and to prevail on a contract claim a party must overcome all affirmative defenses like prior material breach, and the opposing party who raises them should not be allowed to suggest to the jury that overcoming those

55

defenses was unnecessary). Yet, we agree that work performed on a garnishment proceeding or other entities' bankruptcy proceedings are not so clear cut. BBX's controverting affidavit raised a genuine issue of material fact as to reasonableness and specifically, whether fees for certain tasks should have been segregated or were so interwoven with claims having recoverable attorney's fees they could not be segregated. *See id.* at 313–14 ("[O]nly when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated."). Given the existence of a genuine fact issue regarding the reasonableness of the attorney's fees, remand is necessary. *See Wich v. Fleming*, 652 S.W.2d 353, 358 (Tex. 1983) ("the determination of the disputed fact issue of attorney's fees was improper in a summary judgment proceeding."). We sustain this issue.

## Conclusion

We determine GeoSouthern conclusively established its breach of contract claim, declaratory judgment claim, and Texas Natural Resources claim. GeoSouthern was entitled to statutory prejudgment interest under Texas Natural Resources Code section 91.403. GeoSouthern further conclusively established that express contracts provided for recovery of payment for the services BBX sought in its "Cash Call" letters, precluding any recovery by BBX in quantum meruit and conclusively negating BBX's right to recover under promissory estoppel. We

reverse the prejudgment interest award under Texas Finance Code section 302.002, and we remand to the trial court for a prejudgment interest calculation under Texas Natural Resources Code section 91.403. We reverse the attorney's fees award and remand to the trial for further proceedings consistent with this opinion.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART.

_____
CHARLES KREGER
Justice

Submitted on June 10, 2021
Opinion Delivered July 29, 2021

Before Kreger, Horton and Johnson, JJ.